[No. 32514-4-II. Division Two. May 1, 2007.]

THE STATE OF WASHINGTON, *Appellant*, v. MARCUS A. CARTER, *Respondent*.

352

*Marcus A. Carter*, pro se.

*Russell D. Hauge, Prosecuting Attorney*, and *Randall A. Sutton* and *Jeremy A. Morris, Deputies*, for appellant.

¶1 VAN DEREN, J. — The State appeals the dismissal of a machine gun possession charge, contrary to RCW 9.41-.190(1) and .010(7), against Marcus Alton Carter. The trial court dismissed the charge because the State lacked sufficient evidence to prove that an "ammunition supply device," defined by RCW 9.41.010(7), was present at the scene. The State argues that the statute does not require it to show the presence of an ammunition supply device and that the trial court erred in disregarding its evidence that such a device was present. Because RCW 9.41.010(7) contemplates a weapon accompanied by an ammunition supply device and because the State did not respond with an affidavit containing evidence of an ammunition supply device, the trial court did not err in dismissing the State's case on Carter's *Knapstad*[1] motion. We affirm and construe the trial court's dismissal to be without prejudice.

FACTS

¶2 Carter was the chief instructor of a certification course for firearms safety instructors. Two investigators

---

[1] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

from the Pierce County Prosecuting Attorney's Office, Bruce Jackson and Frank Clark, attended the course. As part of the instruction, Carter asked the students to familiarize themselves with a firearm and prepare for practical training presentations. These included demonstrating how to operate the weapon.

¶3 From the available firearms, Jackson selected a Colt AR-15 rifle that Carter had identified as his personal rifle. Having owned an AR-15 since the '70s, Jackson was familiar with its normal functions. He noticed that the safety/ selector switch was not characteristic of the AR-15; instead it resembled one from a military M-16 that could be moved to a full automatic fire position. He then opened the weapon and found a nonstandard "auto sear block," which suggested that the weapon had been modified to fire as a machine gun. Clerk's Papers (CP) at 2. He also noticed that the standard hammer had been replaced with an M-16 hammer.

¶4 After class, Jackson and Clark asked Carter if he had modified the rifle for automatic fire. He admitted that he had. When they told him that possessing such a weapon was illegal, he offered to demonstrate that it would not function in automatic mode but said that he needed to "get some ammunition first." CP at 45. During the investigators' ensuing attempts to confiscate the rifle, Carter insisted on his constitutional right to bear arms, and his teenage son claimed that the law against possession of automatic firearms was stupid because semiautomatic fire was more accurate and effective, while automatic fire "just sprayed a lot of bullets everywhere." CP at 48.

¶5 Jackson and Clark eventually seized the rifle without an ammunition supply device. The Washington State Patrol Crime Laboratory examined it and found that it contained "the following parts from an M16 rifle—Safety (selector), Disconnector, Trigger, Hammer, and Bolt Carrier." CP at 32. Examiners also test-fired it after they inserted an ammunition supply device and determined that it was capable of automatic fire at an average rate of 787 rounds per minute.

¶6 The State charged Carter under RCW 9.41.190(1) and .010(7) for possession of a machine gun. The trial court initially suppressed the weapon as unlawfully seized, and we affirmed. *State v. Carter*, noted at 112 Wn. App. 1046 (2002). The Supreme Court reversed and remanded for trial. *State v. Carter*, 151 Wn.2d 118, 129-30, 85 P.3d 887 (2004).

¶7 Carter then brought a *Knapstad* motion to dismiss on the ground that the rifle did not meet the statutory definition of a machine gun because it did not have a " 'reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.' " CP at 52 (quoting RCW 9.41.010(7)). In its response to this motion, the State did not deny the absence of an ammunition supply device, but argued, instead, that this showing was unnecessary. At the motion hearing, however, the State offered an e-mail exchange between Jackson and a prosecutor in which Jackson said there were magazines present at the scene.

¶8 The trial court determined that the State had to show the presence of an ammunition supply device as described in the statute and concluded that there were no facts before it alleging that the State could prove this. Possibly referring to Jackson's e-mail, the trial court stated that "this is not part of the record and not part of what has been considered up to now." Report of Proceedings (RP) at 13. It then dismissed the case "*with prejudice*, pursuant to *State v. Knapstad.*" CP at 70. The State appeals.

## ANALYSIS

### I. AMMUNITION SUPPLY DEVICE REQUIREMENT

¶9 The State assigns error to the trial court's dismissal of the case based on lack of evidence that the firearm had an ammunition supply device. According to the statute:

"Machine gun" means any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or

instrument not requiring that the trigger be pressed for each shot *and having a reservoir clip, disc, drum, belt, or other separable mechanical device* for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

RCW 9.41.010(7) (emphasis added). The trial court interpreted this provision to require "a firearm that has a clip."[2] RP at 13.

¶10 The State challenges the dismissal on three grounds: (1) it was unnecessary to prove the presence of an ammunition supply device; (2) even if this showing were required, there was evidence of such a device; and (3) even without the device, there was sufficient evidence of machine gun-specific parts to convict Carter under RCW 9.41.190(1).

II. STATUTORY LANGUAGE

¶11 The State argues that RCW 9.41.010(7)'s language on "and having" an ammunition supply device requires "any firearm into which a magazine could be inserted and which could then fire five or more shots per second" and does not require the physical presence of an ammunition supply device. Br. of Appellant at 8.

¶12 In construing a statute, we look to the legislature's intent. *State v. Faust*, 93 Wn. App. 373, 376, 967 P.2d 1284 (1998) (citing *State v. Williams*, 62 Wn. App. 336, 338, 813 P.2d 1293 (1991)). While "[p]lain language does not require construction," *Faust*, 93 Wn. App. at 376 (citing *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994)), "a statute that is susceptible to two or more reasonable interpretations is ambiguous." *Faust*, 93 Wn. App. at 376 (citing *State v. Sunich*, 76 Wn. App. 202, 206, 884 P.2d 1 (1994)). Under the rule of lenity, when a criminal statute is ambiguous and the legislative intent is insufficient to

---

[2] The State claims the trial court found that the clip must actually be inserted into the gun. The record does not support this claim. Rather, it appears the trial court simply stated, consistent with the statute, that the gun must have a clip.

clarify it, the ambiguity must be resolved in favor of the accused. *In re Pers. Restraint of Hopkins*, 137 Wn.2d 897, 901, 976 P.2d 616 (1999); *State v. Padilla*, 95 Wn. App. 531, 534 n.2, 978 P.2d 1113 (1999) (citing *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 250 n.4, 955 P.2d 798 (1998)).

 ¶13 The State's proffered definition conflicts with the statute's plain language. The primary definitions of the verb "have" are "**a :** to hold in possession as property"; "**b :** to hold, keep, or retain"; "**c :** to consist of"; "**d :** CARRY, BEAR, SUPPORT"; and "**e :** to be possessed by." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1039 (2002). None of these definitions construes "have" as meaning "capable of taking," as the State argues. CP at 30. Rather, all five imply an actual possessory or ownership relationship between two specific entities. Definition c, which is the most applicable to inanimate objects, would suggest that the ammunition supply device must be a component part of the firearm. Thus, the State's broad interpretation exceeds the bounds of "having." RCW 9.41.010(7).

¶14 Moreover, the State's definition does not fit the legislature's intent. In amending the firearms statutes, the legislature's intent was to reduce violence by "keeping all firearms out of the hands of certain individuals and certain firearms out of the hands of all individuals." *Padilla*, 95 Wn. App. at 534-35 (citing LAWS OF 1994, 1st Spec. Sess., ch. 7, § 101). The statute itself is clear that the feature of machine guns that motivated the legislature to keep them out of the hands of unlicensed individuals is the capacity for automatic fire; in the words of the statute, the ability to fire "at the rate of five or more shots per second." RCW 9.41.010(7). But without some means of storing and supplying ammunition to the firing mechanism, bullets must be loaded into the weapon individually and the weapon is incapable of automatic fire, rendering it no more dangerous than a single-shot firearm. Thus, the State's interpretation conflicts with both the statute's plain language and legislative intent.

¶15 We also examine how close the relationship between the device and the gun must be for the gun to "have" an ammunition supply device. RCW 9.41.010(7). Certainly the interpretation the State imputes to the trial court, that the clip must be inserted into the gun, defies legislative intent. Under such a restrictive definition, a criminal could hold the gun in one hand and the clip in the other and not possess a machine gun, a result that would fail to reduce crime by keeping machine guns out of the hands of unlicensed persons.

¶16 An interpretation that better serves this policy applies the same rules of possession to an ammunition supply device as applies to a gun. A person possesses a gun if it is in his custody or control. *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997) (citing *State v. Staley*, 123 Wn.2d 794, 798, 872 P.2d 502 (1994)). "Possession may be actual or constructive"; constructive possession means the person has "dominion or control over [the firearm] or over the premises where the firearm [is] found." *State v. Turner*, 103 Wn. App. 515, 520-21, 13 P.3d 234 (2000) (citing *Echeverria*, 85 Wn. App. at 783).

¶17 Requiring the State to show that Carter had possession of the ammunition supply device at the same time he had possession of the firearm comports with the statute's plain language because the State must show that the firearm had an ammunition supply device as a component part. This also satisfies the legislative intent because a defendant with dominion or control over both the gun and the clip is capable of quickly assembling a machine gun and firing an automatic stream of ammunition. This interpretation is also consistent with our case law on inoperable or disassembled firearms. *See State v. Berrier*, 110 Wn. App. 639, 645-46, 41 P.3d 1198 (2002) (An unloaded or even inoperable firearm is still a firearm under RCW 9.41.010(1).); *Padilla*, 95 Wn. App. at 535-36; *Faust*, 93 Wn. App. at 381.

¶18 In *Faust*, we considered whether a malfunctioning gun was a firearm under RCW 9.41.010(1). *Faust,* 93 Wn.

App. at 375-76. We determined that it was, noting two policy considerations: (1) that a malfunctioning or unloaded gun can create the same apprehension in a victim as a properly functioning or loaded one and (2) that a malfunctioning or unloaded gun has potential to inflict violence because it can be fixed or loaded. *Faust*, 93 Wn. App. at 381. But in the context of the machine gun prohibition, for the first policy to apply, the weapon must create more apprehension than a legal, nonautomatic weapon. This is not the case here.

¶19 In explaining how he knew the weapon had been modified from a legal firearm to one capable of automatic fire, Jackson emphasized his familiarity with this type of firearm. Presumably, someone familiar enough with the rifle to recognize these alterations would also understand that it was incapable of automatic fire without an ammunition supply device. Thus, absent such a device, the firearm in question would have been no more capable of creating apprehension in a victim than a legal version of the same rifle. The second policy consideration is distinguishable because the malfunctioning gun in *Faust* was not missing a component piece specifically listed in the defining statute. *See Faust*, 93 Wn. App. at 375.

¶20 *Padilla* and *Berrier* dealt with disassembled guns. In *Padilla*, the defendant held the weapon in his hand before throwing it on the ground, and police recovered it in three pieces. *Padilla*, 95 Wn. App. at 533. Division One of this court found that this was a firearm, noting "that it could be reassembled in a matter of seconds." *Padilla*, 95 Wn. App. at 536. In *Berrier*, police found the defendant and the butt end of a partially disassembled shotgun in the front seat and the sawed-off barrel in the backseat of a car. *Berrier*, 110 Wn. App. at 643. We held that the weapon was a firearm, even though disassembled and unloaded, because its presence could create a deadly situation if police or others did not know it was unloaded or inoperable and because such a weapon could be used to intimidate, frighten, or control persons unaware of its condition.

*Berrier*, 110 Wn. App. at 645-46. In each case, the defendant had actual or constructive possession of all component parts of the firearm.

¶21 Here, there was no essential ammunition supply device present. Carter, therefore, did not have actual or constructive possession of all necessary component parts of a machine gun, and the trial court did not err.

¶22 In a related argument, not discussed in the State's appellate brief but which the State raised at oral argument, the State asserts that the modifiers

> not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second

apply only to the language "or any other mechanism or instrument," and not to the preceding terms in the definitional statute, "any firearm known as a machine gun, mechanical rifle, submachine gun." RCW 9.41.010(7).

¶23 The State's argument creates an ambiguity in RCW 9.41.010(7). Under the State's interpretation, it could reasonably mean that a machine gun is either something known as a machine gun, mechanical rifle, or submachine gun, or it is something with the specifically listed characteristics. But it could also reasonably be interpreted as presuming that the firing mechanism, the ammunition supply device, and the firing speed are inherent in machine guns, mechanical rifles, and submachine guns, and that any other device with these characteristics is also a machine gun.

¶24 The doctrine of ejusdem generis " 'requires that general terms appearing in a statute in connection with specific terms are to be given meaning and effect only to the extent that the general terms suggest items similar to those designated by the specific terms.' " *City of Seattle v. State*, 136 Wn.2d 693, 699, 965 P.2d 619 (1998) (quoting *Dean v. McFarland,* 81 Wn.2d 215, 221, 500 P.2d 1244 (1972)).

¶25 In *State v. Van Woerden*, 93 Wn. App. 110, 116, 967 P.2d 14 (1998), we stated that " ' "[b]odily injury" means physical pain or injury, illness, or an impairment of physical condition.' " (emphasis omitted) (quoting RCW 9A.42-.010(2)(a)). Based on this definition, the State argued that the term "illness" included both physical and mental illness, not just physical illness. *Van Woerden*, 93 Wn. App. at 116. We viewed the State's argument as reasonable given that the word "physical" modified the terms in the phrases preceding and following "illness," but did not modify "illness," and given that dictionary definitions of "illness" include both physical and mental illness. *Van Woerden*, 93 Wn. App. at 116. But we noted that under the ejusdem generis rule, "illness" must be interpreted as something similar to the words accompanying it. *Van Woerden*, 93 Wn. App. at 117. Thus, "illness" needed to be similar to "physical pain or injury" and "impairment of physical condition." *Van Woerden*, 93 Wn. App. at 117. This suggested that the legislature intended to limit "illness" to physical illness. *Van Woerden*, 93 Wn. App. at 117. Finding the statute therefore ambiguous, we applied the rule of lenity and interpreted the statute in favor of the defendant, concluding that "illness" meant only physical illness. *Van Woerden*, 93 Wn. App. at 117.

¶26 Likewise, the rule of ejusdem generis requires that the general term "machine gun" be similar to the more specific definition, i.e., it must be similar to devices not requiring "that the trigger be pressed for each shot," that are capable of firing "at the rate of five or more shots per second," and that have an ammunition supply device. RCW 9.41.010(7).

¶27 Moreover, we note that the dictionary definition of "submachine gun" includes both automatic and semiautomatic weapons. *See* Webster's Third New International Dictionary 2276 (2002). If we were to apply the State's interpretation, the AR-15, being a semiautomatic firearm, could qualify as a machine gun even without Carter's modifications. But the State's entire case is predicated on the theory

that the AR-15 was a legal firearm until Carter modified it for automatic fire. The descriptors "not requiring that the trigger be pressed for each shot" and capable of firing "at the rate of five or more shots per second" are necessary to avoid application of the machine gun ban to semiautomatic firearms, which the parties apparently agree are legal and which otherwise fall under the definition of "submachine gun." RCW 9.41.010(7).

¶28 Thus, to avoid an absurd result, we assume that the legislature intended the series of specific descriptors, including the ammunition supply device requirement, to apply to the series of general terms preceding and including "or any other mechanism or instrument." RCW 9.41.010(7). And even if the State's argument succeeded in creating some ambiguity in this interpretation, the rule of lenity would require us to construe that ambiguity in Carter's favor. *Van Woerden*, 93 Wn. App. at 117.

¶29 Accordingly, we hold that to prove possession of a machine gun, the State must show possession of a firearm capable of automatic fire and of a corresponding ammunition supply device. This interpretation is consistent with the statute's plain language, legislative intent, and the rule of lenity, and it limits impairment of the right to bear arms. The State therefore needed to show that while Carter possessed a rifle modified for automatic fire, he also had dominion or control over "a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second," or over the premises in which such a device was found. RCW 9.41-.010(7).

III. Evidence of an Ammunition Supply Device

¶30 The State argues that it presented direct and circumstantial evidence that there was an ammunition supply device with the gun. Our Supreme Court set forth the requirements for pretrial dismissal of a prosecution.

A Washington defendant should initiate the motion by sworn affidavit, alleging there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt. The affidavit must necessarily contain with specificity all facts and law relied upon in justification of the dismissal. *Unless specifically denied, the factual matters alleged in the motion are deemed admitted. The State can defeat the motion by filing an affidavit which specifically denies the material facts alleged in the defendant's affidavit.* If material factual allegations in the motion are denied or disputed by the State, denial of the motion to dismiss is mandatory.

*Knapstad*, 107 Wn.2d at 356 (emphasis added).

¶31 Here, Carter properly initiated the motion by sworn affidavit, in which he alleged that on the date in question, "there was no 'reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition.'" CP at 52. The State's response did not deny Carter's allegation that there was no such device. The State's statement of "Facts in the Light Most Favorable to the Prosecution" did not mention the presence of such a device. CP at 28. Nor did the reports that the State relied on to oppose the motion mention an ammunition supply device. And the State claimed in its argument section only that it was unnecessary to prove this. The State's failure to deny Carter's allegation constituted an admission. *See Knapstad*, 107 Wn.2d at 356.

¶32 The State argues that four pieces of evidence created a factual dispute about the presence of an ammunition supply device: (1) Jackson would testify that magazines designed to fit into an AR-15 were present at the scene, (2) Carter offered to take Jackson and Clark to the firing range to demonstrate the gun's operation, (3) Carter asked Clark to demonstrate how to unload the gun, and (4) Carter's son commented on how the gun fired in automatic mode. The fourth item is irrelevant, as the context shows Carter's son was describing automatic fire in general and certainly was not claiming that this particular gun had been fired on automatic on the date in question. CP at 48. The second and

third are vague, circumstantial evidence that require presumptions not in the record—that Carter was going to use a clip in his possession to demonstrate how the gun fired and that the unloading involved a clip, rather than simply placing a bullet in the chamber—to create an inference that the gun had an ammunition supply device.

¶33 The first item is direct evidence. It was not, however, part of the record before the trial court on the *Knapstad* motion. The State had already admitted, by failing to deny in its response, that there was no such device at the scene. The State and the concurrence argue that the trial court was required to consider "the State's offer of evidence that magazines were present when the gun was first observed." Br. of Appellant at 2. The State and the concurrence misperceive the evidence that was presented to the trial court by the State.

¶34 Jackson admitted that they did not confiscate an ammunition supply device at the scene at the Criminal Rule (CrR) 3.6 hearing.[3] Specifically, at the hearing on March 24, 2000, Jackson testified:

> Carter: Mr. Jackson, that evening you took the rifle, did you take, did you confiscate as well, any mechanical device for storing, carrying or supplying ammunition?
>
> Jackson: No.

CP at 59.

¶35 The concurrence writes:

> During oral argument before this court, Carter stated that the trial court's file contained a transcript of the pretrial hearing. At that CrR 3.5 hearing, Jackson testified that he had seen Carter using an ammunition magazine while demonstrating the illegal weapon during a class he had attended. The trial court should have considered this testimony when determining the merits of Carter's motion to dismiss.

---

[3] The concurrence refers to a CrR 3.5 hearing. The only evidence in the record on appeal is from Carter, who refers to a CrR 3.6 hearing and attaches the above quote from it.

Concurrence at 371. But the State did not present or even point to the transcript of a CrR 3.5 hearing on October 22, 2004, nor is there any record on appeal from such a hearing. At the *Knapstad* motion hearing on October 22, 2004, the State argued:

> The defense has asked for the State to furnish a witness list. In the process of doing that, I was going to furnish him again with another set of discovery to make sure everything was square. In the process, I discovered an e-mail exchanged between Kevin Hull, the former prosecutor on this case, and Bruce Jackson, one of the State's primary witnesses. I'm not sure if the e-mail was previously issued in discovery. I am going to be issuing it to the defense today, but I would like to hand up a copy to the court.
>
> I don't think it's really dispositive as to the issue, but I think it's extra, that explains a little bit more of the background information regarding the incident, which he talks about the fact that there were magazines present at the scene, at the time, that were part of the demonstration. Each student was required to lock the magazine in place, into an AR-15. It happens in this case, when the AR-15 was seized, that no magazine was seized as well, but there were magazines present.

RP at 4.

¶36 Carter responded:

> Even with this piece of paper Mr. Lindsay was kind enough to hand to me here, we do have a record, where under oath these gentlemen admitted to not knowing if the magazines there actually went with that firearm and what amount of ammunition if any they would actually hold, so there is nothing in the record that shows that any device that day with that fire amp would have allowed all three of those elements to come together, and there are devices and magazines, et cetera, and whatnot that are out there that would only allow a single loading of a firearm, that can be clipped into that firearm, in what is commonly called a magazine well.

RP at 9.

¶37 The prosecutor then again referred to the unsworn e-mail, not to sworn testimony:

My understanding from reading the e-mail, which is a statement written up by Bruce Jackson, who was present, who was one of the individuals involved, was that there was [sic] in fact magazines present for that gun there that day. They were not seized when that gun was taken. That's my understanding of the reading of that e-mail.

RP at 12. The record does not show what the e-mail actually said or whether it referred to Jackson's prior sworn testimony.

¶38 An affidavit is a "voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths, such as a notary public." BLACK'S LAW DICTIONARY 62 (8th ed. 2004). An e-mail exchange between an attorney and a witness does not fit this definition.

¶39 We have never strayed from *Knapstad*'s affidavit requirement. *See State v. Freigang*, 115 Wn. App. 496, 502, 61 P.3d 343 (2002); *see also State v. Jackson*, 82 Wn. App. 594, 608, 918 P.2d 945 (1996). In *Jackson*, we clarified that a court must examine the sufficiency of the evidence based on the best factual basis then available. *Jackson*, 82 Wn. App. at 608. But we also stated that in a pretrial dismissal, "a court examines sufficiency based on facts supplied by affidavit." *Jackson*, 82 Wn. App. at 608. In *Freigang*, we noted that, unlike a civil summary judgment, "in a *Knapstad* motion, the State's affidavit of probable cause and responding affidavit can be made by someone not competent to testify in the trial." *Freigang*, 115 Wn. App. at 502 (citing *Knapstad*, 107 Wn.2d at 356). We held that the trial court erred by refusing to consider the State's affidavit based on Civil Rule (CR) 56(e)'s requirement that the affiant be competent to testify. *Freigang*, 115 Wn. App. at 502.

¶40 Here, unlike in *Jackson* and *Freigang*, the evidence in question was not presented by affidavit, as *Knapstad* plainly requires, and the trial court therefore would have erred in considering it. *See Knapstad*, 107 Wn.2d at 356. Nor was the evidence presented to the trial court in the

form of a certified transcript of sworn testimony from a CrR 3.5 or CrR 3.6 hearing. Whether such evidence could have been properly considered by the trial court we leave to another day, positing that such evidence would seem to supply the necessary indicia of reliability required of an affidavit. But under the circumstances here, we hold that the trial court did not err in finding the State presented insufficient evidence to allow the case to go forward to trial and in granting Carter's motion to dismiss.

IV. MACHINE GUN PARTS

¶41 [11] The State contends, finally, that the case should not have been dismissed because there was evidence that Carter possessed "any part designed and intended solely and exclusively for use in a machine gun," as proscribed by RCW 9.41.190(1). Br. of Appellant at 13. A party cannot raise a new argument on appeal unless it meets certain exceptions that do not apply here. RAP 2.5(a); *State v. WWJ Corp.*, 138 Wn.2d 595, 602, 980 P.2d 1257 (1999). The State did not include this claim in its response to Carter's *Knapstad* motion, did not argue it in the motion hearing, and did not object to dismissal on this ground. Accordingly, the State failed to preserve the error for appeal, and we decline to review it.

V. CARTER'S CONSTITUTIONAL CLAIMS

¶42 Carter filed a motion to dismiss the State's appeal, in which he argued passionately that the statutes under which he was charged violate his constitutional rights. Our commissioner denied the motion. *See* Ruling Den. Mot. to Dismiss Appeal. The motion is now being treated as Carter's respondent's brief. *See* Letter from Kitsap County Prosecuting Atty's Office.

¶43 Carter raised identical claims in his prior appeal before us and before the Supreme Court. *See* State's Mot. to Modify and Resp. to Carter's Mot. to Modify, Apps. A and D. We held that the issue was not before us after "[a] commissioner denied the motion and a panel of judges

denied Carter's motion to modify." *State v. Carter*, 2002 Wash. App. LEXIS 1796, at *23 n.16. The Supreme Court held that Carter's arguments were "unsupported and without merit." *Carter*, 151 Wn.2d at 129. We have no authority to consider claims the Supreme Court has determined lack merit.

■■ ¶44 Moreover, because Carter requests additional relief of a declaration of unconstitutionality, this is a cross-appeal. But Carter has not filed a notice of appeal as RAP 5.1(d) required. In addition, he is not appealing from a trial court decision pursuant to RAP 10.3(a)(3). And because he prevailed at the trial level, he has not shown that he is an aggrieved party who may seek review under RAP 3.1. In short, Carter has not properly invoked the court's jurisdiction to review a constitutional claim, and we decline to reach these issues.

## VI. REMEDY

■■ ¶45 The proper remedy when a *Knapstad* motion is granted is dismissal without prejudice. *Knapstad*, 107 Wn.2d at 357; *Freigang*, 115 Wn. App. at 502. Appellate courts have inherent authority to consider issues not raised by the parties if necessary to " 'serve the ends of justice.' " *State v. Aho*, 137 Wn.2d 736, 740-41, 975 P.2d 512 (1999) (quoting RAP 1.2(c)); *see also Alverado v. Wash. Pub. Power Supply Sys.*, 111 Wn.2d 424, 429-30, 759 P.2d 427 (1988) (noting that it is proper for appellate courts to consider issues not raised by the parties if there is no dispute of law). Accordingly, although the State did not raise the question of dismissal with or without prejudice before the trial court and did not assign error to it on appeal, we construe the trial court's dismissal to be without prejudice.

¶46 Affirmed, clarifying that the order of dismissal is without prejudice.

HOUGHTON, C.J., concurs.

¶47 QUINN-BRINTNALL, J. (concurring in the result) — I write separately because I believe the majority's decision

rests on a hypertechnical reading of *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986), and *State v. Freigang*, 115 Wn. App. 496, 502, 61 P.3d 343 (2002), and improperly holds that the only evidence a trial court may consider in deciding the propriety of a *Knapstad* motion is the deputy prosecutor's sworn affidavit. I do not believe this to be the law.

¶48 In announcing the proper *Knapstad* procedure, our Supreme Court stated:

> A Washington defendant should initiate the motion by sworn affidavit, alleging there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt. The affidavit must necessarily contain with specificity all facts and law relied upon in justification of the dismissal. Unless specifically denied, the factual matters alleged in the motion are deemed admitted. The State can defeat the motion by filing an affidavit which specifically denies the material facts alleged in the defendant's affidavit. If material factual allegations in the motion are denied or disputed by the State, denial of the motion to dismiss is mandatory. *If the State does not deny the undisputed facts or allege other material facts, the court is required to ascertain in the omnibus hearing whether the facts which the State relies upon, as a matter of law, establish a prima facie case of guilt.* If the motion is granted the court must enter a written order setting forth the affidavits *and other materials* it has considered and its conclusion regarding the insufficiency of the evidence.

107 Wn.2d at 356-57 (emphasis added).

¶49 Nothing in this procedure limits the trial court's consideration of available evidence to the deputy prosecutor's affidavit under all circumstances, and to the extent that the majority opinion does so, it errs. Although the procedure states that the State "can" deny the factual allegations by affidavit, the *Knapstad* court did not state the *only* way the State could deny the factual allegations is by affidavit and it specifically contemplates the trial court, when determining whether the State's case is sufficient, will examine all of the evidence presented in the case up to

and during hearing on the defendant's motion. While there may be circumstances when a deputy prosecutor's affidavit is the only factual basis available to the trial court when a defendant moves to dismiss, that is not the case here. Marcus A. Carter's motion to dismiss was preceded by other court proceedings at which the parties presented evidence.

¶50 As Judge Morgan pointed out in his concurring opinion in *Freigang*,

> "In a criminal case, a defendant may challenge the sufficiency of the evidence (a) before trial, (b) at the end of the State's case in chief, (c) at the end of all the evidence, (d) after verdict, and (e) on appeal. In each instance, *the court takes the evidence and the reasonable inferences therefrom in the light most favorable to the State*.

> "Before trial, a court examines sufficiency based on facts supplied by affidavit. At the end of the State's case in chief, a court examines sufficiency based on the evidence admitted at trial so far. At the end of all the evidence, after verdict, or on appeal, a court examines sufficiency based on all the evidence admitted at trial. Each succeeding basis is more complete, and hence better, than the one before.

> "*Regardless of when a court is asked to examine the sufficiency of the evidence, it will do so using the best factual basis then available.* For this reason, a defendant who presents a defense case in chief "waives" (i.e., may not appeal) the denial of a motion to dismiss made at the end of the State's case in chief, and a defendant who goes to trial may not appeal the denial of a *Knapstad* motion. This does not mean that a defendant is barred from claiming insufficiency at a late stage of the proceedings merely because he or she failed to do so earlier; *it does mean, however, that the claim will be analyzed using the most complete factual basis available at the time the claim is made.*"

115 Wn. App. at 507-08 (Morgan, J., concurring) (emphasis added) (quoting *State v. Jackson*, 82 Wn. App. 594, 607-09, 918 P.2d 945 (1996), *review denied*, 131 Wn.2d 1006 (1997)).

¶51 Here, Carter filed his motion to dismiss after the Supreme Court reversed the trial court's order suppressing

evidence. The trial court had entered the suppression order after hearing evidence at a pretrial CrR 3.5 hearing. The most complete account of the State's evidence against Carter, therefore, included the transcript of the testimony from that hearing. In an e-mail message referencing his testimony during the pretrial hearing, the witness, Bruce Jackson, disputed Carter's claim that he did not have ammunition for the weapon. But the trial court expressly declined to consider the testimony at the CrR 3.5 hearing or Jackson's e-mail referencing his earlier testimony. The trial court suggested that it was limited to considering the statements that the deputy prosecuting attorney had filed in response to Carter's motion to dismiss. But no case requires such a hypertechnical procedure. To the contrary, a court addressing a challenge to the sufficiency of the evidence such as is required by a *Knapstad* motion is required to analyze the motion using the most complete factual basis available at the time the claim is made. *Jackson*, 82 Wn. App. at 607-09.

¶52 During oral argument before this court, Carter stated that the trial court's file contained a transcript of the pretrial hearing. At that CrR 3.5 hearing, Jackson testified that he had seen Carter using an ammunition magazine while demonstrating the illegal weapon during a class he had attended. The trial court should have considered this testimony when determining the merits of Carter's motion to dismiss.

¶53 I believe the majority's approach in this case is contrary to the premise upon which *Knapstad* motions were established. In *Knapstad*, the court determined that the trial court has the "inherent power" to dismiss a prosecution if the State fails to show it has evidence establishing a prima facie case, and that dismissal of a case where the State fails to show it had a prima facie case is in the interests of justice. 107 Wn.2d at 351-52. Considering the *Knapstad* court's focus on the "interests of justice," it is difficult to imagine that the State's highest court intended to create a strict procedure that would prevent the State

from going forward with a case for which it has prima facie evidence merely because the prosecutor's affidavit did not contain all of the necessary information when *all* of the evidence available to the trial court ultimately established a prima facie case. *See* CrR 8.3(b).[4] To require strict compliance with an affidavit process and not allow the trial court to examine the evidence as a whole would be to elevate form over substance.[5]

¶54 Accordingly, I respectfully dissent from that portion of the majority opinion purporting to limit the form of the State's response to a defendant's *Knapstad* motion to an affidavit from a deputy prosecuting attorney. As I read the controlling case law, such an affidavit is competent evidence, even though the affiant is not a competent witness, but the trial court is not required to ignore hearsay evidence from competent witnesses who previously testified under oath to matters about which they have personal knowledge. Thus, in this case, it was error for the court to ignore Jackson's prior testimony and the e-mail communication with the deputy prosecutor reaffirming his availability to testify to the same information at trial without first determining whether this evidence would ultimately be admissible at trial.

¶55 For this reason, I would reverse the trial court's order of dismissal and remand for trial on the merits.

---

[4] CrR 8.3(b) states:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial. The court shall set forth its reasons in a written order.

[5] Notably, the record also shows that the State filed its response to Carter's *Knapstad* motion three days *before* Carter filed his written motion. Although I cannot tell from the record exactly why this occurred or the specific argument that prompted the State's response, this procedure also does not strictly comply with the rules stated in *Knapstad*. Furthermore, because the State filed its briefing first and the record does not show why, it is impossible to tell whether the State was aware it had to contest a factual issue prior to filing its response and its supporting documentation.

¶56 In addition, I note that the dismissal order of the Kitsap County Superior Court in this case reads:

This matter having come on regularly before this court on the 22nd day of October, 2004, upon motion in the above entitled action, for an order of dismissal for and because the State has insufficient evidence to support a conviction and the court having heard argument and examined said motion and affidavits, and being fully advised in the premises, now therefore, it is hereby; **Ordered** that the instant matter is dismissed *with prejudice*, pursuant to *State v. Knapstad.*

Clerk's Papers (CP) at 70 (emphasis added). The trial court's authority to dismiss criminal charges under a *Knapstad* motion is limited, however, to dismissal *without prejudice*. *Knapstad*, 107 Wn. 2d at 357 ("A dismissal and discharge under this procedure is not a bar to a subsequent prosecution for the same offense based on additional evidence."). By its terms, the trial court's order here exceeded this authority.

¶57 Although the majority's factual statement notes that the trial court dismissed the matter " 'with prejudice,' " majority at 355 (quoting CP at 70), it later purports to "construe the trial court's dismissal to be without prejudice." Majority at 368. Even if I agreed with the majority's ultimate disposition of this case, I would clarify that the trial court's order dismissing "with prejudice" was in error and that the State may refile the charges on a showing of probable cause should it see fit to do so.