[No. 37389-1-II.    Division Two.    February 23, 2010.]

THE STATE OF WASHINGTON, *Respondent*, v. GORDON ROBERT
HAMMOCK, *Appellant*.

*Eric J. Nielsen* and *David B. Koch* (of *Nielsen, Broman & Koch PLLC*), for appellant.

*L. Michael Golden, Prosecuting Attorney,* and *Lori E. Smith, Deputy,* for respondent.

¶1 BRIDGEWATER, J. — Gordon Robert Hammock appeals from his convictions of first degree felony murder, first degree unlawful possession of a firearm, attempted intimidating of a witness, unlawful possession of a controlled substance—methamphetamine, and unlawful use of drug paraphernalia. We hold that a hollowed-out bolt, in which a bullet is inserted, when used with a hammer to strike the bullet is a firearm under former RCW 9.41.010(1) (2001). Additionally, the trial court did not err in denying Hammock's mistrial motion over comments regarding Hammock's prior conviction for a serious felony and his familiarity to law enforcement. We affirm.

## FACTS

¶2 After an extended period of using drugs and arguing with William Ford, Hammock handed his girl friend, Melissa McKee, a .22 caliber bullet, a hollowed-out bolt with a

hexagonal head, and a ball peen hammer, and told her to shoot Ford. Hammock had previously used the device to discharge a bullet. Hammock inserted the shell into the head end of the bolt. McKee placed the nonhead end of the bolt against Ford's head, struck the bullet with the ball peen hammer, and discharged the bullet into Ford's head. Ford did not die immediately. About 20 minutes later, Hammock jumped over the bed without warning and repeatedly hit Ford in the head with a hammer. Ford remained conscious for several more hours. Later Hammock exited the room and returned with a metal object similar to a meat cleaver and struck Ford in the head two or three times. Ford remained alive and conscious, so Hammock knotted an extension cord around Ford's neck and placed a white plastic bag over Ford's head.[1] Hammock also struck Ford again with the metal object once or twice. Ford ultimately died from a gunshot wound to the head, blunt force impacts to the head, and ligature strangulation due to an extension cord knotted around his neck.

¶3 The State charged Hammock by third amended information with first degree murder or, in the alternative, second degree murder; first degree unlawful possession of a firearm; unlawful possession of a controlled substance— methamphetamine; attempted intimidation of a witness; and unlawful use of drug paraphernalia.

¶4 A forensic scientist with the Washington State Patrol Crime Laboratory testified that the .22 caliber bullet is a "rimfire" cartridge, meaning that its primer, the explosive, is around the rim of the cartridge. VI Verbatim Report of Proceedings (VRP) at 132. The primer ignites the gunpowder that provides the gas that propels the bullet. The scientist was able to discharge a bullet from the bolt by striking the rim of the cartridge with a ball peen hammer.

¶5 The jury found Hammock guilty of first degree murder, first degree unlawful possession of a firearm, unlawful

---

[1] McKee did not see Hammock knot the extension cord around Ford's neck, but such inference is reasonable because Hammock was the only other person in the room.

possession of a controlled substance—methamphetamine, attempted intimidation of a witness, and unlawful use of drug paraphernalia. The jury also found by special verdict form that Ford was particularly vulnerable or incapable of resistance during the commission of first degree murder and that Hammock was armed with or in possession of a deadly weapon during the commission of first degree murder.

## ANALYSIS

### A. Dictionary Definition

¶6 Hammock first argues that sufficient evidence does not support his conviction for first degree unlawful possession of a firearm because, under the plain language of former RCW 9.41.040(1)(a) (2005), a bolt is not a firearm. The issue is whether the jury could find that an improvised instrument is a "firearm."

¶7 Sufficient evidence supports the jury's verdict if a rational person viewing the evidence in the light most favorable to the State could find each element proved beyond a reasonable doubt. *State v. Montgomery*, 163 Wn.2d 577, 586, 183 P.3d 267 (2008). An appellant claiming insufficiency of the evidence admits the truth of the State's evidence and all inferences reasonably drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are equally reliable, and we defer to the trier of fact on conflicting testimony, witness credibility, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

¶8 A person is guilty of first degree unlawful possession of a firearm if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted of any serious offense as defined by chapter 9.41 RCW. Former RCW 9.41.040(1)(a). Hammock stipulated that he had been convicted of a serious offense, so the only issue is whether he possessed a firearm.

¶9 Initially, we reject Hammock's attempt to have us look solely at the bolt because he possessed more—a bolt,

a bullet, and a hammer. As the State notes, nothing in the definition of "firearm" requires that the weapon or device be self-contained or all in one piece. Br. of Resp't at 7. Further, firearms historically were not self-contained. We thus determine whether the bolt system was a firearm.

¶10 The trial court instructed the jury that a "firearm" is "a weapon or device from which a projectile may be fired by an explosive such as gunpowder." Clerk's Papers at 112; *see also* former RCW 9.41.010(1). Hammock contends that the bolt does not meet the dictionary definition of "weapon" or "device" because those words are "singular noun[s]," and the bolt cannot, by itself, fire anything. Br. of Appellant at 29-30. Former RCW 9.41.010 does not define "weapon" or "device."

¶11 We interpret statutes de novo. *State v. Berry*, 129 Wn. App. 59, 69, 117 P.3d 1162 (2005), *review denied*, 158 Wn.2d 1006 (2006). When called on to interpret a statute, we give effect to the legislature's intent. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). When interpreting a statute, we first look to its plain language. *Armendariz*, 160 Wn.2d at 110. If the plain language is subject to only one interpretation, our inquiry ends. *Armendariz*, 160 Wn.2d at 110. To determine an undefined term's plain meaning, we look to the dictionary. *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002).

¶12 A "weapon" is "an instrument of offensive or defensive combat : something to fight with : something (as a club, sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy . . . WEAPON applies to anything used or usable in injuring, destroying, or defeating an enemy or opponent." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2589 (2002). A "weapon" is also "[a]n instrument used or designed to be used to injure or kill someone." BLACK'S LAW DICTIONARY 1624 (8th ed. 2004).

¶13 Hammock contends that the bolt does not meet the definition of "weapon" because it is not an instrument for combat and is not something to fight with. Br. of Appellant at 29. We disagree. The bolt system meets the definition of

"weapon." The bolt, hammer, and bullet, when considered together, constitute an instrument of offensive combat. It was also something used to destroy or physically injure. Hammock inserted the bullet into the bolt, handed it back to McKee, and told her to shoot Ford. McKee put the bolt up to Ford's head, struck it with a hammer, and discharged the bullet into Ford's head. Ford died partly from this gunshot wound to the head. This constitutes an "instrument" used to injure or kill someone. WEBSTER'S, *supra*, at 2589; BLACK'S, *supra*, at 1624.

¶14 We hold that the bolt system meets the definition of "device" as well. Former RCW 9.41.010(1). A "device" is "something that is formed or formulated by design and usu[ally] with consideration of possible alternatives, experiment, and testing : something devised or contrived : . . . a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." WEBSTER'S, *supra*, at 618.

¶15 Here, Hammock formulated and designed this bolt system. Despite Hammock's expert's insistence that the bolt is a bicycle bolt, there is evidence that Hammock drilled the hole in the bolt to fit a .22 caliber bullet. Hammock had been working on the system "in various forms" for "a while." VIII VRP at 61. Previously, McKee had seen it with other pieces connected, including a trigger mechanism. Hammock had previously used the device to discharge a bullet into the ground. In addition, the bolt served not only to hold the cartridge but also to direct the bullet toward a specific target: Ford's head. The bolt system is therefore a thing that Hammock formulated by design, with consideration of alternatives, that he experimented with, tested, and designed to perform the special purpose of discharging a .22 caliber bullet out of the bolt in a specific direction. We hold that in this circumstance, because of the

planning, effort, and experimentation Hammock put into the bolt system, the bolt system constitutes a "device."[2]

## B. Other Subsections of RCW 9.41.010

¶16 Hammock also argues that other subsections of former RCW 9.41.010 show that the legislature never intended to treat a bolt system as a firearm. We disagree. To determine a statute's plain meaning, this court may look at the wording of related statutes. *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005).

¶17 The relevant portions of former RCW 9.41.010 stated:

Unless the context clearly requires otherwise, the definitions in this section apply throughout this chapter.

(1) "Firearm" means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder.

(2) "Pistol" means any firearm with a barrel less than sixteen inches in length, or is designed to be held and fired by the use of a single hand.

(3) "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(4) "Short-barreled rifle" means a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(5) "Shotgun" means a weapon with one or more barrels, designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned, made or remade, and intended to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a

---

[2] We do not hold that this device was a zip gun because the evidence did not support this theory.

number of ball shot or a single projectile for each single pull of the trigger.

(6) "Short-barreled shotgun" means a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun by any means of modification if such modified weapon has an overall length of less than twenty-six inches.

(7) "Machine gun" means any firearm known as a machine gun, mechanical rifle, submachine gun, or any other mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into the firearm, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

(8) "Antique firearm" means a firearm or replica of a firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898, including any matchlock, flintlock, percussion cap, or similar type of ignition system and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(9) "Loaded" means:

(a) There is a cartridge in the chamber of the firearm;

(b) Cartridges are in a clip that is locked in place in the firearm;

(c) There is a cartridge in the cylinder of the firearm, if the firearm is a revolver;

(d) There is a cartridge in the tube or magazine that is inserted in the action; or

(e) There is a ball in the barrel and the firearm is capped or primed if the firearm is a muzzle loader.

(10) "Dealer" means a person engaged in the business of selling firearms at wholesale or retail who has, or is required to have, a federal firearms license under 18 U.S.C. Sec. 923(a). A person who does not have, and is not required to have, a federal firearms license under 18 U.S.C. Sec. 923(a), is not a dealer if

that person makes only occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or sells all or part of his or her personal collection of firearms.

¶18 Hammock argues that the bolt system is not a firearm because it does not meet the definition of specific types of firearms listed in former RCW 9.41.010(2)-(8), cannot be loaded as defined in former RCW 9.41.010(9), and need not be sold by a licensed dealer as defined in former RCW 9.41.010(10). These terms are defined because they are used throughout chapter 9.41 RCW. *See* former RCW 9.41.010 ("Unless the context clearly requires otherwise, the definitions in this section apply throughout this chapter"). They do not add requirements to, modify, or limit former RCW 9.41.010(1)'s definition of "firearm."

¶19 Former RCW 9.41.010(1) uses the general terms "weapon" and "device" to define "firearm." This allows for an inclusive definition of "firearm" beyond the traditional pistol, shotgun, or rifle. But former RCW 9.41.010(2)-(9) narrowly refer to traditional types of guns or components generally found in a gun clip, barrel, action, magazine, chamber, and cylinder. Former RCW 9.41.010(1) broadly defines a "firearm." We reject Hammock's attempt to narrow the interpretation of former RCW 9.41.010(1) by subsections (2)-(9); there is no language to indicate any such restriction.

## C. Case Law

¶20 Hammock argues that under *State v. Berrier*, 110 Wn. App. 639, 645, 41 P.3d 1198 (2002), and *State v. Faust*, 93 Wn. App. 373, 380-81, 967 P.2d 1284 (1998), a bolt is not a firearm because it cannot be used to intimidate, frighten, or control people. McKee testified that when she placed the loaded bolt against Ford's head, he jerked his head away. McKee asked Ford, "[W]hat's the matter, are you scared[?]" and placed the bolt back against his head. VIII VRP at 64. There is evidence, then, that the bolt system, like a normal gun, intimidated, frightened, or controlled the victim.

¶21 Hammock also argues that under *State v. Carter*, 138 Wn. App. 350, 358-60, 157 P.3d 420 (2007), the bolt is not a firearm because it does not contain any of the components typically found in a firearm.

¶22 To be a machine gun, a weapon must have the capacity for automatic fire at a rate of five or more shots per second. Former RCW 9.41.010(7). In *Carter*, the weapon at issue did not have an ammunition clip and a user had to manually load ammunition, thus removing any capacity for "automatic fire" at a rate of five or more shots per second as required by former RCW 9.41.010(7). *Carter*, 138 Wn. App. at 355-57. The missing mechanism in *Carter* rendered the weapon incapable of performing a necessary function of a machine gun—firing at a rate of five or more shots per second. *Carter*, 138 Wn. App. at 357 (citing former RCW 9.41.010(7)). In contrast, the bolt system here had every component necessary to discharge a projectile by an explosive such as gunpowder. The bolt held the cartridge; the hammer ignited the primer, which detonated the cartridge and created spark and fire. The spark and fire ignited gunpowder, created gas and pressure that discharged the bullet down the bolt and into Ford's head.

¶23 Because the bolt constitutes a "weapon" or "device" and was used to fire a projectile (a .22 caliber bullet) by an explosive such as gunpowder, we hold that the bolt system was a firearm within the meaning of former RCW 9.41.010(1). Because the bolt system was a firearm, we hold that sufficient evidence supports the jury's finding that Hammock was guilty of first degree unlawful possession of a weapon.

¶24 Hammock also asks us to vacate the jury's deadly weapon finding on count I. Because the bolt system was a firearm, we hold that sufficient evidence supports the jury's deadly weapon enhancement finding for count I.

¶25 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON and HUNT, JJ., concur.

Review denied at 169 Wn.2d 1013 (2010).