# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| FREDERICK BEAU GOULD and JULIE P. GOULD, husband and wife, | No. 42098-8-II |
| Respondents, | |
| v. | |
| HONG BIN IM and NANETTE MARIE IM, aka YOUNG B. IM, husband and wife, | UNPUBLISHED OPINION |
| Appellants. | |

WORSWICK, C.J. — After summary judgment on liability and a bench trial on damages, Hong Bong Im appeals a final judgment to Frederick Gould for breaching a well maintenance agreement. Im argues that the trial court erred by (1) considering supporting affidavits containing inadmissible evidence, (2) reforming the agreement on summary judgment because there was a genuine issue of material fact, and (3) awarding consequential damages that were unforeseeable and speculative. We hold that the trial court did not err when it reformed the contract, that the damages award was not speculative, and that Im failed to preserve his other arguments for appellate review. We affirm.

## FACTS[1]

In August 2007, Gould was remodeling and landscaping his real property with the intention to sell it later that year. In September 2007, Im disconnected Gould's property from the well that was its only source of water. Gould's property had a right to water from a well on Im's

---

[1] The facts are undisputed, except as noted.

property under a well maintenance agreement executed before either of them acquired their properties. But instead of identifying the parcel with the well, the agreement identified a different, vacant parcel that Im also owned. As a result of Im's refusal to allow reconnection to the well for approximately two years, Gould was unable to sell his property before real estate prices plummeted in 2008.

A.      *The Well Maintenance Agreement*

M.C. Daviscourt and his wife owned a property that included three houses, a well, and a creek. All three houses drew water from the well.

In 1991, Daviscourt divided the property into three parcels: The first parcel (Im Parcel 1) contained two houses and the well; the second parcel (Im Parcel 2) was vacant land adjacent to Im Parcel 1 and was the site of the creek; and the third parcel (the Gould Property) was on the other side of a road and had a house on it.

The same year, Daviscourt made a well maintenance agreement to "provide for future use, maintenance and repair of the well." Clerk's Papers (CP) at 259. In part, the agreement stated: (1) "[T]he owners will have the right to draw water from said well," (2) "[n]either part [sic] shall interfere with the use of the well by the other," and (3) "[t]he owners agree to pay a monthly charge . . . to share in electrical cost for the operation of the well pump." CP at 260. The agreement stated that it runs with the land and binds the Daviscourts' successors in interest. Daviscourt recorded two copies of the well maintenance agreement with the Mason County auditor.

2

The well maintenance agreement identifies the Gould Property and assigns it the right to use the well. However, the legal description in this agreement describes Im Parcel 2 as the parcel on which the well is located. In fact, Im Parcel 1 is the site of the well actually connected to the Gould Property.

After making the well maintenance agreement, Daviscourt sold the Gould Property to Nathan Cox in 1991. Daviscourt showed Cox that the Gould Property drew water from the well on Im Parcel 1. Cox paid Daviscourt a share of the monthly electric bill for the well pump. Daviscourt and his wife are now deceased.

B.      *The Well Dispute*

In 2006, Cox sold the property to Gould. Im purchased both Im parcels in May 2007. In the summer of 2007, Gould was extensively remodeling and landscaping his property, preparing to sell it. While Gould owned the property, he did not pay for any part of the well's electricity bills.

After receiving electricity bills despite being away from the property, Im discovered that his well serviced the Gould Property. Based on his research of Mason County records, Im concluded that the well was a private well lacking permits for shared use and that he alone had a right to use it.

In August 2007, Im approached Gould's contractor, objecting to Gould's connection to the well. On August 14, Im sent Gould a letter that stated, "If I don't hear from you by the end of August, I will shut off the connection to your home." CP at 289.

Im received no reply, and Gould's contractor discovered the well was disconnected on September 10. The contractor reconnected the well, but Im disconnected it a second time. On September 17, the contractor found a note on Gould's door stating:

> Well across the street is private. See county records. Do not trespass on our property to access well house. Mason County Sheriff has been informed. Hong 253-532-xxxx. I am taking legal action against the general contractor.

CP at 294. The contractor called Im and faxed him a copy of the well maintenance agreement the following day. Im admitted that he had disconnected the Gould Property from the well and refused to allow reconnection. The well remained disconnected until after August 24, 2009.

## C.   *Summary Judgment and Trial*

Gould commenced an action seeking quiet title in rights to use the well and damages for breach of the well maintenance agreement. Gould moved for partial summary judgment on liability and sought reformation of any mistake in the agreement. He presented a total of 12 supporting affidavits and declarations.

Im asserted that the well maintenance agreement was intended to give the Gould Property's owner the right to draw water from the creek on Im Parcel 2. In support of this assertion, Im presented the affidavit of a licensed surveyor who called the creek a "surface water well." CP at 227.

However, Im's predecessor averred that when he (the predecessor) owned the property "[t]he creek wasn't a well" and the only well on either parcel was the well on Im Parcel 1. CP at 248. Likewise, Gould's predecessor averred that the two Im Parcels contained only one well between 1991 and 2006. According to the declaration of Daviscourt's son, "In 1991 there was

4

only one well on the properties." CP at 258. A longtime neighbor's declaration added, "If there is a second well on Im's property, it is not the well that has continuously served Gould's house since at least 1985." CP at 255.

In his response brief, Im asserted that Gould's motion "relie[d] heavily on unsubstantiated hearsay and other inadmissible evidence," but Im did not specify which statements were inadmissible or cite legal authority in support of this assertion. CP at 244. Otherwise, Im asserted that there was a genuine issue of material fact because Daviscourt's intent was unclear.

In August 2009, the trial court granted Gould's motion, reformed the well maintenance agreement, and scheduled a trial to determine the amount of damages. Gould then reconnected the well, and the Gould Property sold for $1,100,000 in February 2010.

At the October 2010 trial, the trial court allowed both sides to present evidence on whether Im had caused damages willfully. But the trial court's order in limine confined the evidence to the issue of damages and excluded testimony Im planned to offer to show his understanding of his rights in the well.

Gould presented testimony to establish damages. Gould's real estate agent testified that he was prepared to list the Gould Property for $1,600,000 in 2007, but that the disconnection from the well made the Gould Property unmarketable. An expert real estate broker testified that million-dollar properties listed by Gould's agent in 2007 sold on average for 97 percent of their list price. The broker further opined that $1,600,000 was a reasonably certain estimate of the

Gould Property's market value in 2007, but that its market value declined to $1,100,000 in 2010, when it was the only million-dollar property sold in the area.

The trial court found that Im breached the agreement in bad faith. The court's damage award included $455,000 in consequential damages, representing profits lost when Gould sold the property in 2010 instead of 2007 as planned.

## ANALYSIS

### I. EVIDENTIARY OBJECTIONS TO SUPPORTING AFFIDAVITS

Im argues that the trial court erred by considering supporting affidavits that contained hearsay and conclusory statements not based on personal knowledge. Gould responds that Im failed to preserve this argument for appeal. We agree with Gould.

CR 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence." To preserve a claim that statements in a supporting affidavit are not admissible as evidence, a party must object to the specific deficiency or must move the trial court to strike the affidavit before entry of summary judgment. *Parkin v. Colocousis*, 53 Wn. App. 649, 652, 769 P.2d 326 (1989). Failure to object to an affidavit before the entry of summary judgment waives the objection. *Bonneville v. Pierce County*, 148 Wn. App. 500, 509, 202 P.3d 309 (2008).

Im argues that he preserved this objection by raising it below in his brief opposing summary judgment. That brief states only, "[Gould's] summary judgment motion relies heavily on unsubstantiated hearsay and other inadmissible evidence." CP at 244. But Im did not specify, either to the trial court or to us, which portions of Gould's 12 supporting affidavits were,

in his view, inadmissible. Im failed to adequately specify the evidence's deficiency to the trial court, and thus he did not preserve this claim for appeal.

## II. REFORMATION

Im argues that reformation was unwarranted on summary judgment because a genuine issue of fact exists as to whether the well maintenance agreement's language differs from Daviscourt's intent. We disagree.

We review an order granting summary judgment de novo, engaging in the same inquiry as the trial court. *Schmitt v. Langenour*, 162 Wn. App. 397, 404, 256 P.3d 1235 (2011). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "A material fact is one that affects the outcome of the litigation." *Owen v. Burlington N. Santa Fe R.R. Co.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005). In ascertaining whether a genuine issue exists, "[t]he court must consider the facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party. The motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993). "The burden is on the moving party to establish its right to judgment as a matter of law, but the opposing party may not rely on mere speculation or unsupported assertions." *Molsness v. City of Walla Walla*, 84 Wn. App. 393, 397, 928 P.2d 1108 (1996).

In general, a court may not reform an inadequate legal description of a property; however, a court may reform an inadequate legal description resulting from a scrivener's error or

mutual mistake. *Geoghegan v. Dever*, 30 Wn.2d 877, 889, 194 P.2d 397 (1948); *Snyder v. Peterson*, 62 Wn. App. 522, 525-26, 814 P.2d 1204 (1991). The party seeking reformation must establish that reformation is warranted by clear, cogent, and convincing evidence; however, "the mere denial that a mistake was made will not defeat an action for reformation." *Akers v. Sinclair*, 37 Wn.2d 693, 703-04, 226 P.2d 225 (1950).

"A scrivener's error occurs when the intention of the parties is identical at the time of the transaction but the written agreement errs in expressing that intention." *Reynolds v. Farmers Ins. Co. of Wash.*, 90 Wn. App. 880, 885, 960 P.2d 432 (1998). The intentions of the parties to a contract is generally a question of fact. *Paradise Orchards Gen. P'ship v. Fearing*, 122 Wn. App. 507, 517, 94 P.3d 372 (2004). A court ascertains the parties' intent "'by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties.'" *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990) (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254, 510 P.2d 221 (1973)).

Here, the facts establish that Daviscourt intended the well maintenance agreement to give the Gould Property owner the right to use water from the well on Im Parcel 1. Daviscourt made and recorded the well maintenance agreement in 1991, when he owned the Gould Property and the two Im parcels. The purpose of the agreement was to "provide for future use, maintenance and repair of the well" for the benefit of the owners of the Gould Property. CP at 259. At the time of the agreement, pipes connected the Gould Property to the well on Im Parcel 1. Further,

Daviscourt knew that the well on Im Parcel 1 served the Gould Property, and later that same year he showed Cox the source of the Gould Property's water. Nothing in the record suggests that Daviscourt, or his successors in interest other than Im, ever considered the possibility that the Gould Property would obtain its future water from a different, nonexistent connection to a well on Im Parcel 2.

Further, Daviscourt's conduct in performing the agreement after he sold the Gould Property to Cox suggests his understanding of the agreement's meaning. The agreement required the parties to share the well's maintenance and electricity costs. When Cox owned the Gould property, Daviscourt collected from Cox a share of the electric bill for drawing water from the well on Im Parcel 1. Considering the text of the well maintenance agreement and Daviscourt's performance, it is clear that Daviscourt intended the agreement to refer to Im Parcel 1, not Im Parcel 2 as written.

Im contends that in weighing the motion for summary judgment, the court must infer that Daviscourt intended the Gould Property to obtain water from Im Parcel 2. However, that inference is unreasonable. The only water source on Im Parcel 2 is a creek. In 1991, pipes connected the Gould Property to the well on Im Parcel 1; at no time has the Gould property been connected to the creek. Nothing in the record suggests that Daviscourt intended the Gould Property to draw water from a creek or from some other well that did not exist in 1991. Further, Im's inference would render the agreement's provisions regarding the pump and electricity costs ineffective, frustrating the agreement's cost-sharing objective. The only water pump on either

Im parcel is the electric pump serving the well on Im Parcel 1, and without this pump there can be no costs to share.

Im's assertion that Daviscourt intended the well maintenance agreement to refer to Im Parcel 2 receives no support from any reasonable inference. Daviscourt's intention is shown by the existence of only one well on the two Im parcels, the other provisions of the well maintenance agreement, the course of conduct between Daviscourt and Cox, and the absence of any other plausible explanation of Daviscourt's intent. *See Berg*, 115 Wn.2d at 667. Considering the facts submitted and all *reasonable* inferences from those facts in the light most favorable to Im, reasonable persons could conclude only that Daviscourt intended the well maintenance agreement to refer to Im Parcel 1 instead of Im Parcel 2. *See Clements*, 121 Wn.2d at 249; *Molsness*, 84 Wn. App. at 397.

Accordingly, the well maintenance agreement's reference to Im Parcel 2 is the product of a scrivener's error. *See Reynolds*, 90 Wn. App. at 885. The trial court appropriately reformed the scrivener's error in the agreement to match Daviscourt's intention. *See Snyder*, 62 Wn. App. at 525-26.

## III. CONSEQUENTIAL DAMAGES

Im argues that the trial court erred in awarding consequential damages because (1) the amount of the award was speculative and (2) the damages were not reasonably foreseeable.[2] We

---

[2] Im also assigns error to the trial court's determination that Gould did not fail to mitigate damages. But Im's brief does not contain an argument on this assignment of error, as RAP 10.3(a)(6) requires. Therefore, we deem this assignment of error waived. *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986).

hold that the damage award is not speculative and that Im failed to preserve his foreseeability argument for appeal.

In a breach of contract action, an award of consequential damages may include lost profits "when (1) they are within the contemplation of the parties at the time the contract was made, (2) they are the proximate result of defendant's breach, and (3) they are proven with reasonable certainty." *Larsen v. Walton Plywood, Co.*, 65 Wn.2d 1, 15, 390 P.2d 677 (1964).

A.      *Speculation*

Im argues that the trial court based its determination of Gould's lost profits on speculation. We disagree.

In a breach of contract action, a plaintiff may recover damages for lost profits that "are proven with reasonable certainty." *Larsen*, 65 Wn.2d at 15. "[C]onversely, damages which are remote and speculative cannot be recovered." *Larsen*, 65 Wn.2d at 16. A greater degree of certainty is required to prove the *fact* of damages than the *amount* of damages: once it is reasonably certain that the breach caused damages, the fact-finder may determine the amount of the damage award by drawing reasonable inferences from reasonably convincing evidence. *Gaasland Co., Inc. v. Hyak Lumber & Millwork, Inc.*, 42 Wn.2d 705, 713-14, 257 P.2d 784 (1953). Further, when a breach is willful or when the breach itself creates a difficulty in proving damages, the court may relax the plaintiff's burden to establish damages by reasonable certainty. *Larsen*, 65 Wn.2d at 17; RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a (1981).

To prove lost profits, the plaintiff may present a profit history or a reasonable estimate based on an analysis of market conditions and the experience of similar businesses operating in

11

the vicinity and under substantially the same conditions. *Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash.*, 109 Wn.2d 923, 928, 750 P.2d 231 (1988). An award of lost profits can be based on expert testimony alone. *Larsen*, 65 Wn.2d at 17. When a trial court has heard testimony on the amount of lost profits, an appellate court decides only whether the testimony had "a substantial and sufficient factual basis." *Larsen*, 65 Wn.2d at 19.

Here, Gould presented evidence from real estate professionals about sales of million-dollar homes in the Hood Canal area of Mason County. Gould's real estate agent testified that he was prepared to list the Gould Property for $1,600,000 in 2007. An expert real estate broker agreed that the property would have sold in 2007 for "something close to a million six" and reported that the agent's properties sold on average for 97 percent of list price. Verbatim Report of Proceedings (VRP) at 175. Im did not present conflicting testimony on the Gould Property's value. The trial court weighed this testimony and found that the house would have sold in 2007 for 97 percent of its list price, or $1,555,000, if the well disconnection had not made the property unmarketable for approximately two years. Instead, the Gould Property actually sold for $1,100,000, and the expert broker testified that he believed the sale price to represent the property's fair market value in 2010, given that it was the only sale of a million-dollar property in that area during the whole year. The trial court then determined that Gould's consequential damages equal the 2007 market value less the 2010 market value, or $455,000.

Im argues that the basis of this finding is speculative because high real estate prices in 2007 were an "anomaly" and because the testimony did not prove that Gould would have found a buyer in 2007. But the evidence, including expert testimony, showed that the house could have

sold for its market value in the fall of 2007, if it had water. An analysis of market conditions is not speculative when supported with substantial and sufficient facts, whether or not market conditions are anomalous. *See Farm Crop Energy*, 109 Wn.2d at 928. Moreover, any difficulty in proving the precise amount of the Gould Property's 2007 market value was directly caused by Im's breach, which prevented the house from being listed in 2007. *See Larsen*, 65 Wn.2d at 17.

In addition, Im argues in the alternative that (1) in awarding damages, the trial court improperly considered the willfulness of Im's breach and (2) the trial court's order in limine erroneously prevented Im from presenting evidence that his breach was not willful. We disagree with both arguments.

The first argument fails because the willfulness of Im's breach is a proper matter for the trial court to consider. Im's willfulness is a basis to relax Gould's burden of proving reasonably certain damages. *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 cmt. a.

The second argument fails because the trial court's order in limine did not prevent Im from introducing evidence of whether he acted willfully. The order restricted the evidence to items relevant to the issue of damages. The trial court specifically stated, "I'm not shutting the door as to something that may have a bearing on willfulness." VRP at 58. The trial court reserved rulings on the admissibility of particular pieces of evidence, per its "standard practice in any trial." VRP at 58.

Im's arguments fail. The damages the trial court awarded were reasonably certain and not speculative.

B.     *Foreseeability Issue Waived*

Im argues that the consequential damages award was improper because the damages were not reasonably foreseeable to Daviscourt at the time of the contract. Gould contends that Im never asserted that the trial court should consider foreseeability from the Daviscourts' standpoint at the time the agreement was made, and that Im is not entitled to make this argument for the first time on appeal. Gould is correct.

We will generally not consider an issue or theory raised for the first time on appeal. RAP 2.5(a); *Lunsford v. Saberhagen Holdings, Inc.*, 139 Wn. App. 334, 338, 160 P.3d 1089 (2007). "The reason for this rule is to afford the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials." *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983). If a party becomes aware of an alleged error only after the trial has ended, he should bring it to the trial court's attention in a motion for a new trial. *Smith*, 100 Wn.2d at 37.

Im argues that he raised the issue at trial under the standards of *Osborn v. Public Hospital District 1*, 80 Wn.2d 201, 492 P.2d 1025 (1972), and *East Gig Harbor Improvement Association v. Pierce County*, 106 Wn.2d 707, 724 P.2d 1009 (1986). But neither case supports Im's argument. *Osborn* permits a party to invoke a statute for the first time on appeal if it pertains to an issue that was squarely before the trial court. 80 Wn.2d at 206. But Im's foreseeability argument does not mention any statute. In *East Gig Harbor*, the parties preserved an issue by arguing it and discussing relevant precedent in their trial briefs, even though they did not clearly frame the issue before the trial court. 106 Wn.2d at 709-10 n.1. Here, Im's trial brief and motion for a new trial never mentioned foreseeability at the formation of the contract.

Im did not raise this issue below.[3] Im is not entitled to make this argument for the first time on appeal, and we decline to exercise our discretion to let Im do so here. Affirmed.[4]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, C.J.

I concur:

_____
Hunt, J.

---

[3] Im cites two portions of the trial transcripts about "the issue of foreseeability." Reply Br. of Im at 18 & n.4 (citing VRP at 141-45, 283-85). Neither portion articulates Im's new argument. In the first portion, Im's counsel cross-examined the expert real estate broker on whether the national economic downturn affected real estate prices in the Hood Canal area. In the second portion, Im's counsel agreed "for the sake of argument" that lost profits were "predictable" while making an argument on the mitigation of damages. VRP at 284.

[4] The concurrence/dissent arrives at a different result after (1) finding that Im did not know that Gould wished to sell his house and (2) deciding that the proper measure of Gould's consequential damages is a reasonable rental. We do not consider these issues because Im neither raised these issues in the trial court, nor asked us to consider them on appeal. *See* RAP 10.3(a)(4), (6). Im never argued lost rental as the measure of damages. Although we may affirm the decision below on any grounds supported by the record, RAP 2.5(a), we do not *reverse* the decision below *on grounds that the parties have never mentioned. See* RAP 12.1. It is not the function of an appellate court "to comb the record with a view toward constructing arguments for counsel." *In re Estate of Lint*, 135 Wn.2d 518, 532, 957 P.2d 755 (1998); *see also* RAP 10.3(a)(6).

No. 42098-8-II

QUINN-BRINTNALL, J. (concurring in part, dissenting in part) — While I concur with my colleagues in that portion of the majority opinion holding that Hong Bin Im failed to preserve his challenge to Frederick Beau Gould's supporting affidavits and that reformation of the well maintenance agreement was appropriate on summary judgment, I believe the trial court clearly misapplied the law in calculating its damage award. Because consequential damages are only appropriate when the special circumstances occasioning lost profits are known by the party breaching a contract—and the record here reflects that Gould presented *no evidence* that Im had knowledge of Gould's intent to improve and then immediately sell the home—I dissent.

KNOWLEDGE OF SPECIAL CIRCUMSTANCES

The common law has long recognized that consequential damages are appropriate in certain circumstances. Baron Alderson explained the rationale behind such an award over 150 years ago:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it. Now, if the *special circumstances* under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such a contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were *wholly unknown to the party breaking the contract*, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract.

16

*Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854) (emphasis added).[5]

In arriving at the damage award in this case, the trial court incorrectly *assumed* that Im was aware of the "special circumstances" involved here, that Gould was attempting to sell his home. *See, e.g.*, 4 Report of Proceedings (RP) at 308 ("In this particular case, the Plaintiff -- the facts are clear that the Plaintiff was remodeling a house to sell.").[6] And because of this assumption, the trial court awarded Gould the difference between what his home could have sold for at the height of the real estate boom (although Gould never had an offer) and what it did sell for after the market dramatically fell.[7]

In calculating the damage award, the record shows that the trial court discussed an alternative remedy: awarding the estimated amount the Goulds could have received in rent

---

[5] The United States Supreme Court has cited the *Hadley* decision for this proposition numerous times, first approving of the decision in *Western Union Telegraph Co. v. Hall*, 124 U.S. 444, 8 S. Ct. 577, 31 L. Ed. 479 (1888). Our own Supreme Court has repeated the *Hadley* holding multiple times with approval. *See, e.g.*, *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 445-46, 815 P.2d 1362 (1991). Section 330 of the *Restatement (First) of the Law - Contracts* (1932) also adopts the language from *Hadley*:

> In awarding damages, compensation is given for only those injuries that the defendant had reason to foresee as a probable result of his breach when the contract was made. If the injury is one that follows the breach in the usual course of events, there is sufficient reason for the defendant to foresee it; otherwise, it must be shown specifically that the defendant had reason to know the facts and to foresee the injury.

[6] The trial court references the fact that Im knew the house was being remodeled multiple times. But the trial court fails to explain why remodeling a house inevitably leads to knowledge of an impending sale.

[7] Although the majority opinion's analysis of why this figure was proven with reasonable certainty is sound, whether proven or not, absent proof of Im's knowledge of Gould's intent to sell the property, this award was inappropriately granted.

(roughly $140,000) while the property was uninhabitable. But the court summarily dismissed that amount stating, "The testimony in this case wasn't that this house really was going to be rented." 4 RP at 317. This damages analysis is legally incorrect.

Under *Hadley* and its progeny, Gould is entitled to lost rents (or, alternatively, to recoupment of expenses accrued while finding alternative housing) because it was foreseeable that Im's actions would render the Gould home uninhabitable. But because the record does not reflect that Im knew of the "special circumstances" related to the Gould property—that the Goulds intended to improve and then immediately sell the home—damages related to the home sale are inappropriate.

Put another way, if a party deprives her neighbor's home of water, it is foreseeable in the "usual course of things" that the neighbor will not be able to live there for a time. Thus, the aggrieved neighbor is entitled to the lost rental value of the property while the water is blocked (or the recoupment expenses accrued while finding alternative housing). But there is no reason for the at-fault neighbor to assume that her aggrieved neighbor intended on improving and immediately selling the home. Without knowledge of such special circumstances, the at-fault neighbor should not be liable for these special damages.

Washington courts have not had occasion to visit this precise issue. However, in *Thompson v. Hanson*, 6 Wn. App. 1, 491 P.2d 1065 (1971), Division Three of this court did consider whether a contractor's contract breach could serve as the basis for a real estate developer's lost profits. In *Thompson*, a real estate developer, Alpine, hired D.S. McHenry to build a sewage plant to service Alpine's properties. 6 Wn. App. at 2. McHenry took an

18

unreasonable amount of time to complete the plant and, in result, Alpine was unable to sell vacant lots on its property as quickly as it had hoped. *Thompson*, 6 Wn. App. at 2-4. Alpine sued McHenry for breach and the trial court found that

> Alpine suffered additional loss of profit due to McHenry's breach inasmuch as there was a substantial increase in the interest rate on construction loans and other economic developments from December 1967 to November 1969 which made it difficult for purchasers to obtain construction financing thereby requiring Alpine to reduce the sales price of vacant lots 25 per cent.

*Thompson*, 6 Wn. App. at 4.

On appeal, Division Three remanded the case for reconsideration of the damage award, concluding that

> [t]he evidence does not sustain a conclusion that the wide swing in interest rates was within the contemplation of the parties at the time the contract was signed; nor was it reasonably foreseeable at that time. Further, there is no specific showing by Alpine that McHenry had special knowledge of the risk created by the unusual increase in interest rates.

*Thompson*, 6 Wn. App. at 5.

Here, the situation is substantially the same. Not only did Gould fail to show that Im had special knowledge of the risk created by the housing market's unforeseen collapse, Gould failed to present any evidence showing that Im knew Gould wanted to sell the home.[8]

---

[8] Last year, the Indiana Court of Appeals had reason to consider a claim even more closely resembling the one at issue here. In *Estate of Collins v. McKinney*, 936 N.E.2d 252 (Ind. Ct. App. 2010), the Indiana court addressed a situation where the at-fault party (the Estate of Collins) caused delay such that the aggrieved party (McKinney) could not purchase and resell real estate at the height of the real estate boom. The *McKinney* court reversed an award of lost profit damages, concluding that

> [t]he award of expectancy-style damages seems inappropriate here for two
> reasons. First, there is no evidence in the record that McKinney communicated to

Although this case concerns a contract breach, the *Restatement (Second) of Torts* (1979) provides a useful analog in thinking through the damages award. Section 931, "Detention or Preventing Use of Land or Chattels," states,

> If one is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include compensation for
>     (a) the value of the use during the period of detention or prevention or the value of the use of or the amount paid for a substitute, and
>     (b) harm to the subject matter or other harm of which the detention is the legal cause.

In illustrating clause (a), the *Restatement* describes a scenario where one party takes possession of another party's land for six months. Although the aggrieved party was not renting the land and had no plans to rent the land, the *Restatement* states that reasonable rental value is the appropriate damage award.

A damage award accounting for the lost rental value of the Gould's property would appear to be the appropriate calculation to apply in the circumstances here. It was foreseeable to Im, in the usual course of things, that shutting off water to the Gould property would make it uninhabitable. And although the Goulds do not appear to have treated the home as a rental

---

> or that Ray Collins otherwise knew that McKinney planned to sell the real estate almost immediately upon closing the sale. . . .
>     Second, there is no evidence from which the trial court could conclude that McKinney's sale was foreseeable in the 'usual course of things'. . . .
>     . . . .
>     Because the evidence and inferences therefrom do not support equitable compensation for lost profits on McKinney's sale of the real estate in 2009 instead of 2007, we reverse the trial court as to the value of the 'damages' awarded and the accompanying award of pre-judgment interest."

936 N.E.2d at 262-63.

property, the appropriate measure of damages is the reasonable rental value of the home as that value most closely approximates the damages foreseeable to Im.

WAIVER

On appeal, Im focuses much of his argument on whether Gould's damages would have been foreseeable to M.C. and Florence Daviscourt (the previous property owners). Im failed to argue this theory of the case below and, as the majority opinion indicates, that argument is waived. However, the motion for a new trial established that Gould never told *Im* that he wanted to sell his property and, accordingly, Im was unaware of the special circumstances attendant on his breach of the well maintenance agreement:

> After serving his complaint in October 2007, Plaintiff failed to file the complaint, or otherwise prosecute his claim, until April 2009. Moreover, between September, 2007, when Defendant disconnected Plaintiff's access to the well, and January 2008, when Plaintiff claims he would have needed to sell his property for maximum value, Plaintiff never informed Defendant that he intended to sell the property, or that Defendant's actions were precluding him from selling the property. Defendant was never informed of the basis for the lion's share of Plaintiff's damages claim, until a couple weeks before trial, in October 2010.

Clerk's Papers at 84. The trial court denied Im's new trial motion.

Because Im fails to reraise this argument in his appellant's brief, the majority considers this issue waived. But because the trial court clearly misapplied the law in this case, I would invoke this court's inherent authority to consider issues briefed and presented to the trial court

21

and to decide the appeal on that issue.[9] *State v. Aho*, 137 Wn.2d 736, 740-41, 975 P.2d 512 (1999); *State v. Carter*, 138 Wn. App. 350, 368, 157 P.3d 420 (2007); RAP 12.1(b). Here, the record clearly reflects that Gould presented no evidence that Im knew the Goulds were real estate speculators and intended to improve and immediately sell the house. The record further reflects that the trial court was presented with, and summarily rejected, the correct amount—lost rental value—of damages Gould should have received for Im's breach. In my view, the trial court simply misapplied Washington law regarding the proper method of calculating damages and awarded Gould an unwarranted windfall. Neither the common law, including 150 years worth of decisions affirming *Hadley*, nor Washington law, as seen in *Thompson*, support such an award. In these circumstances, I do not believe this court must turn a blind eye to the law and refuse to correct an obvious error. The measure of damages is a question of law which we should review and correct when our review of the record reveals error. *See, e.g., Farmer v. Farmer*, 172 Wn.2d 616, 625, 259 P.3d 256 (2011). Accordingly, I would affirm the reformation of the well maintenance agreement but I would remand to the trial court for recalculation of damages under the proper lost rental value formula.

QUINN-BRINTNALL, J.

---

[9] I note also that Im's appellate briefing argues that the damage award was impermissibly speculative and that the collapse of the housing market was unforeseeable by the parties. Although these arguments are not well formulated or conceived—*e.g.*, Im focuses on whether damages would have been foreseeable to the Daviscourts—they are at least cogent enough to alert this court to potential error in the damage award.